[ PHILADELPHIA, FEBRUARY 24TH, 1840. ]

## FREVALL *against* FITCH.

IN ERROR.

1. An instrument in the form of a promissory note, issued by a bank, with the corporate seal on its face, is a specialty; and an endorsement in blank by the payee does not make him liable as the endorser of a negotiable note.

2. Where the payee of a note under seal, endorsed it in blank, and put it in the hands of his partner to obtain money upon it for the use of the firm, and the partner delivered the note to a money broker, who took it to the plaintiff's agent and showed it to him, and on being asked as to the value of the note, pointed to the defendant's endorsement, and assured the plaintiff's agent of his sufficiency, whereupon the plaintiff discounted the note; it was *held*, that the plaintiff might recover back from the defendant, the money paid to the broker.

On the return of a writ of error to the District Court for the City and County of Philadelphia, it appeared that Peter E. Frevall brought an action upon the case, in that Court, against Thomas Fitch.

The declaration contained two counts. In the first, the plaintiff declared that, " whereas, heretofore, to wit, on the 16th day of December, in the year eighteen hundred and thirty-three, at New Brunswick, in New Jersey, to wit, at the city aforesaid, the president and directors of the bank of New Brunswick, made their certain promissory note in writing under the common seal of the said the president and directors of the bank of New Brunswick, bearing date the day and year aforesaid, and thereby then and there promised to pay, at the Merchants' Exchange Bank, New York, four months after date thereof, to the said Thomas Fitch's order, the sum of five thousand dollars, for value received, without defalcation or discount, and then and there delivered the said promissory note to the said Thomas Fitch. The said president and directors of the bank of New Brunswick, being a corporation, duly chartered by two several acts of the legislature of New Jersey,

passed the fourth of December, eighteen hundred and seven, and the second of November, eighteen hundred and twenty four, and then and there being in full corporate action and existence, duly authorised to issue negotiable promissory notes under its common seal by the said charter, whereof the 6th section of the thirteenth article doth declare and provide, that ' the bills obligatory and of credit, under the seal of the said corporation, which shall be made to any person or persons, shall be assignable by endorsement thereupon, under the hand or hands of such person or persons, and his, her or their assignee or· assignees, successively, and shall enable such assignee or assignees to bring and maintain an action thereupon, in his, her or their name or names.' Whereof the said Thomas, before that time, to wit, on the day and year aforesaid, at New Brunswick, to wit, at the city aforesaid, then and there had notice. And the said Thomas Fitch, to whom, or to whose order, the payment of the said sum of money in the said promissory note specified, was to be made, after the making of the said promissory note, and before the payment of the said sum of money therein specified, to wit, on the day and year last aforesaid, at New Brunswick, to wit, at the city aforesaid, endorsed the said promissory note, by which said endorsement, he, the said Thomas Fitch, then and there appointed and ordered the said sum of money in the said promissory note specified, to be paid to the said plaintiff, and then 'and there delivered the said promissory note, so endorsed as aforesaid, to the said plaintiff, by means whereof, and by force of the premises, and of the said charter, and the statute and act of assembly, in such case made and provided, the said Thomas Fitch, then and there became liable to pay to the said plaintiff, the said sum of money in the said promissory note specified, according to the tenor and effect of the said promissory note; and the said plaintiff avers, that afterwards, when the said promissory note became due and payable according to the tenor and effect thereof, to wit, on the nineteenth day of April, in the year eighteen hundred and thirty-six, at the said Merchants' Exchange Bank at New York, to wit, at the city aforesaid, the said promissory note was duly presented and shown to and at the said Merchants' Exchange Bank, New York, for payment thereof, and payment of the said sum of money therein specified, was then and there duly required, according to the tenor and effect thereof, but that neither the said the Merchants' Exchange Bank, nor the said the President and Directors of the Bank of New Brunswick, nor any person or persons on their behalf, did or would, at the time when the said promissory note was presented and shown for payment thereof as aforesaid, or at any time before or afterwards, pay the said sum of money therein specified, or any part thereof, but wholly neglected and refused so to do ; of all which several premises, the said defendant afterwards, to wit, on the day and year last aforesaid, at the city aforesaid, had notice.· By means

(Frevall *v.* Fitch.)

whereof, and by force of the said charter, and the statute and act of assembly in such case made and provided, the said defendant then and there became liable to pay to the said plaintiff the said sum of money, in the said promissory note specified, when he, the said defendant, should be thereunto afterwards required ; and being so liable, he, the said defendant, afterwards, to wit, on the day and year last aforesaid, at the city aforesaid, in consideration thereof, undertook, and then and there faithfully promised the said plaintiff, to pay him the said sum of money in the said promissory note specified, when he, the said defendant, should be thereunto afterwards required."

In the second count the averment that the drawers of the note were a corporation duly chartered and authorised to issue promissory notes, &c. was omitted.

The common money counts were added.

The defendant pleaded non-assumpsit; and on this issue the cause came on for trial before JONES, J., on the 19th of February, 1839, when the plaintiff gave in evidence the note in question, which was in the following words.

" 5000.
[Seal.]          Bank of New Brunswick.
                                    Dec. 16th, 1833.
Four months after date, the President and Directors of the Bank of New Brunswick, promise to pay, to order Thomas Fitch, five thousand dollars, without defalcation or discount, for value received.

. J. C. VANDYKE,

. F. RICHMOND,                              President.
   Cashier."

Endorsed, " THOMAS FITCH."

The plaintiff then gave in evidence the act to incorporate the Bank of New Brunswick, the only material provision of which was the following.

" The corporation shall not directly or indirectly deal or trade in any thing except bills of exchange, promissory notes, gold or silver bullion, or in the sale of goods which shall be the produce of its lands; nor shall the said corporation take more than at the rate of seven per cent. per annum for or upon its loans or discounts."

The plaintiff then proved a demand at the Merchants' Exchange Bank in New York, and notice to the endorser ; and the following testimony was then given.

John B. Stryker. "I know that note. I first saw it in the defendant's possession, about the time of its date. In December, 1833, I think.

(Frevall *v.* Fitch.)

I can't remember if it was endorsed or not when I first saw it. It was handed to me by the defendant, with directions that I should obtain the money on it in the market, on his account. I took it to Mr. John W. Tilford, the broker, and he gave me the money on a discount of, I think, about nine per cent. per annum. I think I got the money of him a day or two after I gave it to him. I left it in Tilford's possession for sale. He is a broker—a note broker: particularly a note broker at that time ; extensively engaged in business as such. The defendant's name was on it when I handed it to Tilford. I did not tell Tilford it was an endorsement on which there was no liability. I said nothing about it. I was directed by the defendant who left home a day or two before this, to obtain the money on this note on the best conditions I could, for the use of our firm, Stryker & Co. The defendant and myself were the firm. The defendant called it a post note. I placed the proceeds to the defendant's credit in our books. It was as so much cash to the defendant's credit in the house."

The following question was then asked by the plaintiff.

" Were there any other notes of the same kind, similarly drawn and endorsed, put into your hands by the defendant, for sale in the market at the same period of time ?"

This question was objected to by the defendant, and overruled and noted for exception.

On his cross-examination by the defendant, the witness said—

"I don't know that the discount was more than six per cent. John B. Stryker & Co., have stopped payment. The affairs of that company have not yet been settled and debts paid. I can't tell if the firm is indebted to the defendant. I don't know that it is indebted to him a dollar. A few days after the discount of the note, the defendant returned to Philadelphia."

John W. Tilford. " I was the broker who sold this note. I got it from Stryker; to whom I paid the proceeds of it. I sold it to Mr. Curcier, Andrew Curcier. It was then endorsed. The endorser was alluded to by me in selling the note, as being a very responsible man. I mentioned him to Curcier as being so. He was so considered at that time. I am hardly able to say if the bank was well known. The defendant was much better known than the bank. I think nothing passed to induce the buyer to believe it was different from other notes. I don't think I saw any other such notes in market."

On his cross-examination by the defendant, he said—

" The defendant was out of town. I had no communication with the defendant before the note was sold. I sold the note for Stryker

(Frevall v. Fitch.)

and received the brokerage. I did not purchase it. I can't recollect what Stryker said when he handed me the note for sale. I can't tell if the bank was in good credit when the note was put into my hand. I don't think I should have bought the note myself. If I believed it to be a genuine note of the bank and endorsed, I would have offered it for sale. I think the bank notes of the bank were circulating at New York. Stryker spoke of his (Stryker) endorsing it Stryker & Co., but I said it was good enough with the defendant's endorsement on it."

Andrew Curcier. " I got the note for Mr. Frevall, of Mr. Tilford. I met Tilford in the street, and told him I had occasion to lay out a few thousand dollars for a friend: that the interest was not an object, and that I would take it as low as it was going in market; but the security must be first chop. He came to my counting-house the same or next day, and told me that he had something that would suit me. Then he showed me that note. I said, what is it—a bank note ? I have never seen anything of the kind before. Said he, ' look to the back of the note:' to the endorser he meant. I did look. 1 told him I had heard of the defendant, but did not know him well enough to take him without inquiry. He referred me to some gentlemen in the ironware business in Market street; Mr. Handy and some others. I went to him and to others. I went to the banks, too, to inquire after him. They told me the defendant was good enough for the money. Tilford called again, by appointment, the same day, or next day, and renewed all he had said about the defendant. That he was rich and had plenty of property, and that the note was as good as anything I could get. Nobody knew anything of the bank ; its paper was selling at a discount. I believe four thousand eight hundred and fifty dollars were paid for the note. It had about four months to run then."

In the course of the trial, the plaintiff's counsel applied for leave to file a new count in which the averment that the instrument was *under seal* was omitted. This was objected to by the defendant's counsel, but admitted by the Court.

The foregoing testimony having been given, the learned judge ordered a non-suit to be entered, being of opinion that the evidence was not sufficient in law to maintain the action.

An application was made to the Court in bank to take off the non-suit, but the motion was denied; and on the 17th of March, 1839, judgment was entered on the verdict.

The plaintiff then obtained this writ of error, and filed the following exceptions.

" 1. The judge below erred in non-suiting the plaintiff, the evi-

(Frevall *v.* Fitch.)

dence given by the plaintiff being such as was in law sufficient to maintain the action.

2. The judge below erred in non-suiting the plaintiff, because,

1. The note was not proved to be a sealed note.
2. The question of the seal was a fact for the jury.
3. The charter of the bank forbade them to deal or trade except in notes.
4. The defendant passed the paper as a note.
5. The evidence showed fraud on the part of the defendant in passing the note.
6. The evidence sustained the common counts, if not the counts on the note.
7. The endorsement by the defendant was a new contract with the plaintiff, and in some sort independent of the face of the note.

3. The judge rejected the evidence offered by the plaintiff, that other notes of the same kind, similarly drawn and endorsed, were put into the hands of John B. Stryker, by the defendant, for sale in the market, at the same period of time when the defendant passed the note to the plaintiff."

Mr. *C. Ingersoll*, for the plaintiff in error argued—

1st. That the defendant was liable as endorser upon this instrument; because, for all that appeared, this was a common negotiable promissory note, there having been no evidence given of any seal; and that it was a question for the jury, whether this was a specialty or not.

2d. That at all events the defendant was liable to refund the money which the plaintiff had paid; because the language and acts of his agent, Stryker, amounted to a warranty of this being an ordinary negotiable note; and that there was in the evidence given enough to go to the jury on a question of fraud.

He cited the following cases. *Taylor* v. *Glaser*, (2 *Serg. & Rawle*, 502.) *Austin* v. *Whitelock*, (1 *Munford*, 487.) *Leazure* v. *Hillegas*, (7 *Serg. & Rawle*, 318.) *Berks and Dauphin Turnpike Co.* v. *Myers*, (6 *Serg. & Rawle*, 15.) *Long* v. *Ramsey*, (1 *Serg. & Rawle*, 73.) *Bize* v. *Dickinson*, (1 *Term Rep.* 286.) *Brisbane* v. *Dacres*, (5 *Taunt.* 144; 1 *Eng. Com. Law Rep.* 49, 50.) *Newsome* v. *Graham*, (10 *Barn. & Cresw.* 234; 21 *Eng. Com. Law Rep.* 63.) *Milner* v. *Duncan*, (6 *Barn & Cresw.* 671; 13 *Eng. Com. Law Rep.* 294.) *Haven* v. *Foster*, (9 *Pickering*, 112.) *Elliott* v. *Swartwout*, (10 *Peters*, 137.) *Borrekins* v. *Bevan*, (3 *Rawle*, 43.) *Jones* v. *Ryde*, (5 *Taunt.* 488; 1 *Eng. Com. Law Rep.* 166.) *Courcier* v. *Ritter*, (4 *Wash. C. C. Rep.* 551.) *Lucas* v. *Groning*, (7 *Taunt.* 164; 2 *Eng. Com. Law Rep.* 61.) He also referred to *Chitty on Bills*, 163; *Story on Agency*, 96.

Mr. *Chester*, contra, cited *January* v. *Goodman*, (1 *Dall.* 228. *Folwell* v. *Beaver*, (13 *Serg. & Rawle*, 311.)　*Clark* v. *Farmers Co.*, (15 *Wendell*, 256.) *Kennedy* v. *Carpenter*, (2 *Wharton*, 344.) *Story's Conflict of Laws*, 251.

The opinion of the Court was delivered by

GIBSON, C. J.—It is clear that recourse to the defendant, cannot be had on his endorsement.　Bearing the corporate seal of the bank on its face, though framed in other respects as a promissory note, the instrument is a specialty; and no obligation arose from the endorsement of it either by the statute or the custom of merchants. But under the circumstances of the transfer, may not the money paid for it be recovered back on the money counts?

The defendant must abide by the representation of the broker who represented him.　The note, as it is called, with the defendant's endorsement of it, was handed by him to his partner to raise money on it on the best terms that could be had; and there was consequently no limitation of his authority.　The partner put it into the hands of his broker, without instructing him that there was to be no recourse to the defendant, and without restriction as to conditions. Thus the broker became the defendant's general agent to dispose of the particular security; and nothing is better established than that, even in the absence of express restriction, the defendant would have been bound by an express guaranty, had the broker entered into one.　In *Fenn* v. *Harrison*, (4 *Term Reports*, 177,) it was settled that the guarantee of an agent employed by endorsees of a bill to get it discounted, binds the employers to refund in case it be dishonoured.　But there was no formal guaranty; and as the law of warranty arising on a sale of chattels, is inapplicable to the transfer of a chose in action, the case could not be brought within the principle of those modern decisions, even did we approve of them, which have, in England and some of the American states, turned every representation into a warranty, in derogation of the actual meaning and intent.　Still if this note was purchased under an erroneous impression received from even an innocent misrepresentation of the seller, it will not be said that the bargain may not be treated as a nullity, and the price be recovered back as so much paid without consideration, and consequently to the plaintiff's use.　It is an elementary principle that an agreement founded in a false conception, is a nullity in respect to the party who misconceived, because he assented to it, not absolutely, but on a condition not verified by the event.　2 *Powell on Contracts*, 196.　What are the facts here? Mr. Curcier, the plaintiff's agent for investment, tells a broker of whom he is inquiring for an eligible fund, that the rate of interest is a secondary consideration　but that the security must, in his own phrase, be first chop: on which the broker produces the note in

(Frevall *v.* Fitch.)

question, and points to the name of his principal as a guaranty. The next day he repeats what he had said, and adds an assurance of the defendant's sufficiency. Now it is fallacious to say that any part of this was not within the scope of his authority. If the defendant did not intend that the note should be negociated on the responsibility of his name, why did he endorse it? To hold out his endorsement as a bait, knowing the paper not to be negociable, would be to meditate a fraud which would make short work with any bargain made on the faith of it; and the most favourable construction that can be made of his conduct, is to assume that he actually intended to incur the responsibility of an endorser. The presumption is that every man who puts his name on paper thrown upon the market, does so to add to its credit; and the defendant either meant to sell on the faith of his endorsement, or he intended to commit a fraud. It is not to be doubted, then, that in the apprehension of the plaintiff's agent, the bargain rested on an assumption of the defendant's responsibility; and, that the endorsement failing, the bargain goes with it. It is insisted, however, that a bargain can be set aside only for a misconception of fact, and not of law with which every one is bound to be acquainted. That position is disproved by *Lansdown* v. *Lansdown*, (*Mosely*, 364,) in which a deed executed on the mistaken advice of a school master in regard to a point of law, was set aside and the party ordered to convey. This principle is not peculiar to equity; for being of the essence of every contract, it is equally enforced at law whenever the Court can look at the consideration, and when a chancellor has not exclusive jurisdiction. How the cause may appear at a second trial, it is impossible to say; but as it appears in our paper book, it presents no obstacle to a recovery. It has been objected that the money was paid to the use of the partners for whom it was raised; but it was paid to the defendant's agent in the first instance, and, by consequence, to the defendant himself, with whom alone the plaintiff stood in privity; and his subsequent advancement of it to the firm, cannot discharge his obligation to refund. The cause is therefore sent to another jury.

Judgment reversed and a *venire de novo* awarded.